IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>SAUL ABRAHAM QUINTANA,<br><br>    Defendant. | 2:24-CR-091-Z-BR-(1) |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Saul Abraham Quintana's ("Defendant") Motion to Suppress ("Motion") (ECF No. 32). Defendant moves to suppress all evidence seized by law enforcement during a search of Defendant's vehicle on November 27, 2024. *Id.* at 1. Defendant argues that law enforcement unreasonably extended the initial traffic stop in violation of the Fourth Amendment. *Id.* For the reasons stated below, the Court **DENIES** Defendant's Motion.

### BACKGROUND

Trooper Castillo is a Texas State Trooper with fourteen years' experience as a law enforcement officer. ECF No. 33 at 1. Trooper Castillo served seven years as an officer with the Pampa Police Department and seven years as a state trooper with Texas Department of Public Safety ("Texas DPS"). *Id.* Trooper Castillo has completed numerous drug interdiction trainings and has participated in numerous highway interdiction stops. *Id.* These stops resulted in "over 50 seizures of controlled substances." *Id.* at 1–2.

On November 27, 2024, Trooper Castillo initiated a traffic stop of a white Kia Sportage for driving 79 miles per hour in violation of the posted speed limit of 75 miles per hour. *Id.* at 2. Defendant was the driver and sole occupant of the vehicle. *Id.* The vehicle had out-of-state license plates. *Id.*

1

After Trooper Castillo activated his emergency lights and stopped Defendant's vehicle, he noticed that Defendant's turn signal remained on after the vehicle fully stopped. *Id.* Trooper Castillo approached the vehicle to talk with Defendant. *Id.* Defendant informed him that the vehicle was a rental and provided him with the rental agreement. *Id.* at 2–3. The rental agreement was for a 24-four-hour rental. *Id.* at 3. Defendant retrieved the vehicle earlier that day, at 8:06 a.m. in Albequerque, New Mexico, and was scheduled to return same the following day—Thanksgiving Day—at 8:10 a.m. in Albequerque. *Id.* Trooper Castillo then asked Defendant to return with him to the patrol car while he completed traffic stop paperwork. *Id.*

Trooper Castillo asked Defendant about his travel plans. *Id.* Defendant told Trooper Castillo he was driving from Albequerque to Amarillo. *Id.* Trooper Castillo asked Defendant why he was visiting Amarillo. *Id.* Defendant replied that he was visiting "some, some nephews." *Id.* When asked if he had family in Amarillo, Defendant replied "nephews." *Id.* But when Trooper Castillo pressed Defendant for his nephews' names, Defendant replied that he only had one nephew. *Id.*

Next, Defendant told Trooper Castillo that the visit was a surprise, and he would be staying for "just a day, two." *Id.* at 4. But when Trooper Castillo later pressed Defendant about his plans, Defendant stated he would be driving back the next day, on Thanksgiving. *Id.* at 4–5. Trooper Castillo asked Defendant where he was staying in Amarillo. *Id.* at 4. Defendant explained he planned to stay in a hotel but did not yet have a reservation. *Id.* When asked what he would do if his nephew were not home, Defendant stated he would return to El Paso. *Id.*

After this, Trooper Castillo questioned Defendant about his work. *Id.* Defendant said he was a truck driver and owned his own trucking company. *Id.* Defendant later explained

he had delivered a load of produce to a Walmart in Los Lunas, and then decided to leave his truck in Albequerque, rent a car, and visit his nephew. *Id.* at 5–6. Defendant stated that he took time off "just for the day." *Id.* at 6.

Trooper Castillo then asked Defendant where his nephew lived in Amarillo. *Id.* at 5. Defendant said, "I don't know exactly, by where Petro is, there, by there." *Id.*; *see also* ECF No. 32-3 at 6. Defendant later told Trooper Castillo he was unsure where his nephew currently lived because his nephew "moves" frequently. *Id.* at 6.

Trooper Castillo also questioned Defendant about his luggage. *Id.* at 5. Defendant told him he had "like two, three" suitcases, and they were both "in the back seat." *Id.* When Trooper Castillo asked Defendant what was in the trunk, Defendant replied "clothes, clothes." *Id.*

After he finished questioning Defendant about his travel plans, Trooper Castillo asked Defendant whether he was transporting any narcotics, weapons, people, or large amount of U.S. currency in the vehicle. *Id.* at 6. Defendant denied transporting anything illegal. *Id.* Trooper Castillo then asked Defendant for consent to search the vehicle. *Id.* Defendant refused consent. *Id.* Accordingly, Trooper Castillo informed Defendant that he would call for a canine unit and conduct a canine free-air sniff of the vehicle. *Id.*

DPS Trooper Blacksher arrived with his canine and conducted a free-air sniff of the vehicle. *Id.* at 7. The canine alerted to the presence of narcotics. *Id.* Trooper Castillo then searched Defendant's vehicle. *Id.* The search revealed two large gym bags. *Id.* Trooper Castillo located bricks of suspected cocaine weighing over 72 pounds. *Id.*[1]

---

[1] Laboratory analysis later confirmed that these brigs contained 30.12 kilograms of cocaine. *See* ECF No. 33 at 7.

LEGAL STANDARD

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. When a search is conducted without a warrant, the Government bears the burden of proving by a preponderance of the evidence that the search was constitutional. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

Courts must generally suppress evidence derived from an unreasonable search or seizure as the "fruit of a poisonous tree." *See United States v. Alvarado-Zara*, 782 F.3d 246, 249 (5th Cir. 2015). And because warrantless seizures are "per se unreasonable under the Fourth Amendment," any evidence seized pursuant to a warrantless search must fall within one of the "few specifically established and well-delineated exceptions" to this general rule. *See id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception is the framework outlined in *Terry v. Ohio*, 392 U.S. 1 (1968).

Traffic stops "constitute a 'seizure' within the meaning of the Fourth Amendment." *United States v. Wallstrum*, 515 F. App'x 343, 348 (5th Cir. 2013). But such a seizure is reasonable—and thus not a violation of the Fourth Amendment—when the two-part *Terry* test is met: (1) the officer's action was "justified at its inception" and (2) the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19–20).

Reasonable suspicion "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette v. California*, 572 U.S. 393, 402 (2014). And courts "cannot reasonably demand scientific certainty where none exists. Rather, they must permit officers to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (internal

citations omitted). The "constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

Although a "defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (internal citations omitted). Accordingly, the Government "bears the burden of establishing by a preponderance of the evidence [the] two elements under *Terry*." *United States v. Johnson*, No. 3:06-CR-016-D, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (citing *Sanchez-Pena*, 336 F.3d at 437); *see also United States v. Riley*, 968 F.2d 422, 424–25 (5th Cir. 1992).

ANALYSIS

The court first considers whether the government met its burden of proof as to the first *Terry* element.

**A. The traffic stop was justified at its inception.**

Defendant does not challenge the constitutionality of the initial traffic stop. *See* ECF No. 32 at 2, n.1. Nor did the Government brief this issue. *See* ECF No. 33. However, because the Government bears the burden to establish that the initial traffic stop was justified, the Court's analysis begins with the initial stop.

For a traffic stop to be justified at its inception, an officer must have "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, *or is about to occur*, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (emphasis added).

Here, Trooper Castillo observed Defendant driving faster than the posted speed limit of 75 miles per hour. ECF No. 33 at 2. Trooper Castillo verified via mobile radar that Defendant was traveling 79 miles per hour, four miles per hour faster than the speed limit. *Id.* Thus, Trooper Castillo had more than mere reasonable suspicion that "a traffic violation occurred." *See Lopez-Moreno*, 420 F.3d at 430. Trooper Castillo explicitly observed Defendant commit a traffic violation. Thus, the traffic stop was justified at its inception.

### B. The traffic stop was properly extended because Trooper Castillo developed reasonable suspicion of additional criminal activity.

The court next addresses whether the Government has established by a preponderance of the evidence that Trooper Castillo's actions after stopping Defendant's vehicle were reasonably related to the circumstances that justified the stop.

Under *Terry*'s second prong, the Court must ascertain if Trooper Castillo's post-stop actions "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010). If, however, "the officer develops reasonable suspicion of additional criminal activity . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (quoting *Pack*, 612 F.3d at 350).

And to determine whether an officer had reasonable suspicion, the Court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*,

6

532 U.S. 266, 273 (2002). Reasonable suspicion exists "when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. And—importantly—courts "may not consider the relevant factors in isolation from each other." *Id.*; *see also Arvizu*, 530 U.S. at 274. Although an officer's "mere hunch will not suffice," the officer's "reasonable suspicion need not rise to the level of probable cause." *Lopez-Moreno*, 420 F.3d at 430.

Furthermore, in evaluating reasonable suspicion, courts must give "due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). And "courts must allow law enforcement "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal citations omitted).

Here, the Court **FINDS** that the totality of Defendant's words and actions provided reasonable suspicion for Trooper Castillo to suspect Defendant was trafficking narcotics and to subsequently detain Defendant after the *initial* traffic stop concluded. Specifically, the Court **FINDS** at least eight categories relevant to the aforementioned "totality of the circumstances" analysis:

- Defendant was traveling on I-40, which is a known drug-trafficking corridor;
- Defendant gave inconsistent statements about the nature of his trip, where he was staying when he reached his destination, and who he was going to visit;
- Defendant was traveling in a rental car, which is the vehicle typically used in drug trafficking operations;
- The rental contract was for a roundtrip, 24-hour rental, a common feature in drug trafficking operations;

- Defendant exhibited signs of nervousness, leaving his turn signal on after the vehicle was stopped;

- Defendant's luggage was separated in different places within his vehicle, a common attribute among drug traffickers;

- Defendant was a truck driver by occupation, and truck drivers are frequently hired to transport narcotics due to their highway driving experience;

- Defendant's purpose for the trip was implausible and inconsistent with the vehicle's rental agreement.

ECF No. 33 at 8–16.

Specifically, Trooper Castillo reasonably interpreted the inconsistencies among Defendant's statements as a sign that Defendant was engaging in criminal activity. *See United States v. Diaz-Carreon*, 915 F.2d 951, 955 (5th Cir. 1990) (holding that "inconsistent statements are inherently suspicious). Defendant twice told Trooper Castillo he had "nephews" in Amarillo. ECF No. 33 at 11. But when Trooper Castillo asked for the nephews' names, Defendant contrarily stated that he had only one nephew in Amarillo. *Id.* And Defendant made inconsistent statements about where his nephew lived. At first, Defendant told Trooper Castillo that his nephew lived near a Petro station, but later he told Trooper Castillo that he was unsure where his nephew lived because he "moves." *Id.* at 11–12. Furthermore, as the Government noted, there are no homes or neighborhoods in the immediate vicinity of the Petro station. *Id.* at 7, n. 1. Defendant further told Trooper Castillo that he had to take time off from work to make the trip, but later stated that he owned his own trucking company. *Id.* at 12.

Regarding these inconsistent statements, Defendant argues that Trooper Castillo was unable to prove that any of Defendant's statements were false. ECF No. 32 at 9. But Trooper Castillo need not prove that any of Defendant's statements were false to form reasonable suspicion. Defendant's statements were inconsistent and vague—a factor which Trooper

8

Castillo could reasonably rely on in forming reasonable suspicion. Defendant further argues that Defendant's uncertainty about where his nephew lived did not support Trooper Castillo's reasonable suspicion. ECF No. 32 at 5–6. Defendant submitted map screenshots showing numerous elementary schools and neighborhoods within an approximately two-mile radius of the Petro station. ECF No. 36. But even if Defendant's statement that his nephew lived "by where Petro is" was not vague, he later contradicted himself by telling Trooper Castillo that he was unsure where his nephew lived and that his nephew "moves" frequently. ECF No. 33 at 6. Accordingly, the Court **FINDS** that Trooper Castillo could reasonably interpret Defendant's contradictory statements as indicative of criminal activity.

Additionally, Defendant's purpose for the trip was implausible and logistically illogical. Defendant told Trooper Castillo he delivered a shipment to Los Lunas. *Id.* at 13. He then decided to make a surprise trip to visit his nephew. *Id.* But instead of driving his own vehicle to Amarillo, Defendant rented an expensive 24-hour rental. *Id.* And as the Government noted, Defendant was unsure whether his nephew was even at home the day he planned to arrive. *Id.* Defendant was unsure where his nephew lived. *Id.* Defendant told Trooper Castillo he planned to stay at a hotel in Amarillo, but he had no reservation. *Id.* And although Defendant's rental was for only 24 hours, Defendant told Trooper Castillo that he planned to stay in Amarillo for one or two days. *Id.* at 12. As such, the Court **FINDS** that Trooper Castillo reasonably developed suspicion based on Defendant's improbable story.

Defendant points to *United States v. Spears* to support his contention that Trooper Castillo lacked reasonable suspicion to prolong the traffic stop. 636 F. App'x 893, 902 (5th Cir. 2016). In *Spears*, the Government identified only four main categories to support its contention that reasonable suspicion existed: the defendant (1) "lied about where he was coming from;" (2) he "appeared nervous;" (3) he "was evasive, non-compliant, and

argumentative;" and (4) "there was a backpack inside his vehicle in plain view." *Id.* The Fifth Circuit held that the officer in *Spears* did not have sufficient reasonable suspicion to prolong the traffic stop. *Id.* at 904. But here, as the Court has identified, Trooper Castillo relied on at least *eight* specific factors to support his reasonable suspicion. And in considering the totality of the circumstances, the Court also relies on Trooper Castillo's fourteen years of experience as a law enforcement officer—and his extensive drug interdiction training. *See Brigham*, 382 F.3d at 507 (instructing courts to give "due regard to the experience and training of the law enforcement officers" in analyzing the totality of the circumstances). Accordingly, the Court **FINDS** that Trooper Castillo plausibly developed "reasonable suspicion" based on at least eight different factors, and *Spears* does not dictate a finding otherwise.[2]

\* \* \*

Taken together—and based on the totality of the circumstances—these eight categories of facts could lead a reasonable and prudent officer to develop additional reasonable suspicion that Defendant was engaged in drug trafficking. And the preponderance of the evidence reflects that Trooper Castillo developed additional reasonable suspicion of ongoing criminal activity during the initial stop—thus authorizing him under *Terry* and its progeny to detain Defendant while conducting a canine sniff. Therefore, the Court **FINDS** the Government met its burden to prove by a preponderance of the evidence that Trooper Castillo properly extended the stop to dispel additional reasonable suspicion which arose during the initial traffic stop. Thus, the Court **FINDS** the Government satisfied both prongs of the *Terry* analysis such that the entire traffic stop was justified.

---

[2] Additionally, as the Government correctly noted in its brief, *Spears* is an unpublished opinion and thus holds no precedential value. *See United States v. Reyes*, 963 F.3d 482, at 490 (5th Cir. 2020) (explaining that *Spears* is "unpublished and therefore non-precedential").

## CONCLUSION

Here, Trooper Castillo had reasonable suspicion to conduct and extend the initial traffic stop. Accordingly, the Court **FINDS** the subsequent search of Defendant's vehicle and the seizure of 30.12 kilograms of cocaine was lawful under the Fourth Amendment. For the reasons stated above, Defendant's Motion to Suppress is **DENIED**.

**SO ORDERED**.

June 4, 2025

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE